IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAFAYETTE COLLINS,

    Petitioner,                                    No. CIV S-07-2709 MCE CHS P

    vs.

M.C. KRAMER, et al.,

    Respondent.                  <u>FINDINGS AND RECOMMENDATIONS</u>

    _____/

## I. INTRODUCTION

Petitioner Lafayette Collins is a state prisoner proceeding pro se with a petition for writ of habeas corpus brought pursuant to 28 U.S.C. §§ 2254. Petitioner is currently serving an indeterminate prison term of seven years to life for a 1984 first degree murder conviction in the Napa County Superior Court. Petitioner does not challenge the propriety of his conviction; rather, he challenges its execution, and specifically, the constitutionality of the June 15, 2005 decision of the Board of Parole Hearings ("Board") finding him unsuitable for parole.

Petitioner contends that the Board's decision was unsupported by some evidence. He further argues that the proper evidentiary standard for reviewing the Board's parole decisions on habeas corpus is a preponderance of the evidence rather than the some evidence test. Finally, petitioner contends that the Board's use of parole suitability regulations implemented under

1

California's Determinate Sentencing Law (DSL), rather than the parole regulations of the Indeterminate Sentencing Law (ISL), which were in effect when he committed his offense, constituted an ex post facto violation. As set forth below, it is recommended that the petition be denied.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On September 15, 1975, the 63 year old victim's body was discovered in his home lying face down on the living room floor. (Ex. G[1] at 11-12.) His hands and feet were tied. (*Id*. at 12.) The victim had suffered a broken nose and other injuries. (*Id*. at 18.) An autopsy was performed; the cause of death was "heart failure due to coronary artery thrombosis" with trauma as a contributing cause. (Ex. 10 at 2.)

Nine years later, petitioner's latent fingerprints were identified and he was arrested for the crime. (Ex. G at 19-20.) Although no other arrests were made, petitioner claims to have had a crime partner. At the parole suitability hearing, petitioner stated that he and his crime partner were let in the victim's home to use the telephone. (*Id*. at 14-15.) Petitioner states that he watched his crime partner tie the victim's hands and then left the room to ransack the house. (*Id*. at 13-19.) Petitioner denies any other knowledge of assault or abuse to the victim. (*Id*. at 13-19.)

Petitioner was convicted under the felony murder rule of first degree murder and sentenced to an indeterminate term of seven years to life. He was received in the state prison on August 17, 1984. His minimum eligible parole date passed on February 6, 1991. On June 15, 2005, the Board of Parole Hearings conducted the parole suitability hearing at issue and determined that he was unsuitable for parole.

In finding petitioner unsuitable for parole, the Board relied on the circumstances of his commitment offense, finding that it was carried out in a manner that demonstrated a

---

[1] All citations to lettered exhibits are to the petition; all citations to numbered exhibits are to respondent's answer.

callous disregard for human suffering, and that the motive for the crime was extremely trivial. (Ex. G at 83-84.)  The Board also found that petitioner had an escalating pattern of criminal conduct and an unstable social history which included past assaultive behavior.  (*Id*. at 84.)  In addition, the Board found that petitioner still lacked insight into his crime and that he had not sufficiently participated in beneficial self-help programming.  (*Id*. at 84-85.)  Petitioner's inconclusive psychological evaluation and prison disciplinary history were also noted by the Board in its reading of the decision.  (*Id*. at 85-87.)

Petitioner raised his claims arising from the Board's denial in a petition for writ of habeas corpus in the Napa County Superior Court.  The claims were denied in brief reasoned opinions.  (Ex. 2 & 5.)  His subsequent petitions filed in the California Court of Appeal, First Appellate District, and the California Supreme Court were summarily denied.  (Ex. 7 & 9.)

### III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

1  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). The court must look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

IV.  DISCUSSION

      A.    The Board's decision was supported by some evidence, which is the proper standard of review.

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Kentucky Dep't. of Corrections v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause or from state laws.  *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution does not, in and of itself, create a protected liberty interest in a parole date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  However, where a state's statutory scheme uses mandatory language, it "creates a presumption that parole release will be granted" when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest.  *McQuillion*, 306 F.3d at 901 (*quoting Greenholtz v. Inmates of Nebraska Penal*, 442 U.S. 1, 12 (1979)).  The Ninth Circuit has conclusively determined that California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a parole release date."  *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (*citing Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*,

4

334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903; and *Allen*, 482 U.S. at 377-78 (*quoting Greenholtz*, 442 U.S. at 12)).

The full panoply of rights afforded a defendant in a criminal proceeding is not constitutionally mandated in the context of a parole proceeding. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). The Supreme Court has held that a parole board's procedures are constitutionally adequate if the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Greenholtz*, 442 U.S. at 16. The Ninth Circuit has also made clear that Supreme Court law clearly establishes that some evidence must support a parole decision. *Sass*, 461 F.3d at 1128-29; *McQuillion*, 306 F.3d at 904. Petitioner's contrary assertion that the appropriate judicial standard should be a preponderance of the evidence is incorrect. *Id*.

Under the some evidence standard, a decision cannot be "without support" or "arbitrary." *McQuillion*, 306 F.3d at 904 (*citing Superintendent v. Hill*, 472 U.S. 445, 457 (1985)); *Biggs*, 334 F.3d at 915. It must have some indicia of reliability. *Id*. The standard is "minimally stringent," and a decision must be upheld if there is any evidence in the record that could support the conclusion reached. *Powell v. Gomez*, 33 F.3d at 40 (*citing Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105 (9th Cir. 1986). Examination of the entire record is not required. *Id*. The Supreme Court has specifically directed reviewing courts not to assess the credibility of witnesses or re-weigh the evidence. *Hill*, 472 U.S. at 455. The only relevant question is whether there is *any* reliable evidence in the record that could support the decision reached. *See Id.*; *Toussaint*, 801 F.2d at 1105.

In evaluating whether some evidence supported the Board's decision, the analysis "is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851. The court is bound by California's construction of its own laws in this regard. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). The court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for

1  parole, and then must review the record to determine whether the state court decision holding

2  that these findings were supported by 'some evidence' [ ] constituted an unreasonable application

3  of the 'some evidence' principle." *Id*.

4  Title 15, Section 2281 of the California Code of Regulations sets forth various

5  factors to be considered by the Board in its parole suitability findings for life prisoners.  The

6  regulation is designed to guide the Board's assessment of whether the inmate poses "an

7  unreasonable risk of danger to society if released from prison," and thus whether he or she is

8  suitable for parole. *In re Lawrence*, 44 Cal.4th 1181, 1214, 1202 (2008).  The Board is directed

9  to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs. tit. 15, § 2281(b).  The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole. Cal. Code Regs. tit. 15, § 2281 (c)-(d).  The overriding concern is public safety and the focus is on the inmate's *current* dangerousness. *In re Lawrence*, 44 Cal. 4th at 1205. "[T]he proper articulation of the standard of review is not whether some evidence supports the *reasons* the Board cites for denying parole, but whether some evidence indicates that a parolee's release *unreasonably endangers public safety*. *See In re Lawrence*, 44 Cal.4th at 1254.

Here, the Board determined that petitioner was unsuitable for parole, in part, because of the nature of his commitment offense.  A prisoner's commitment offense can be a parole unsuitability factor where it was committed in an especially heinous, atrocious or cruel manner.  15 Cal. Code Regs. § 2281(c)(1).  Relevant factors which were found by the Board in this case include that the offense was carried out in a manner which demonstrates an

6

exceptionally callous disregard for human suffering (15 Cal. Code Regs. § 2281(c)(1)(D)), and that the motive for the crime was inexplicable or very trivial in relation to the offense (15 Cal. Code Regs. § 2281(c)(1)(E)). The gravity of the commitment offense alone can be a sufficient basis for denying parole in cases where the facts are especially heinous or particularly egregious. *In re Rosenkrantz*, 29 Cal.4th 616, 682 (2002); s*ee also Biggs v. Terhune*, 334 F.3d 910, 913-16 (9th Cir. 2003); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1126 (9th Cir. 2006); *Irons v. Carey*, 505 F.3d 846, 852-53 (9th Cir. 2007).[2]

In this case, there is evidence that petitioner's elderly victim sustained a broken nose and other injuries and was tied up on his living room floor to die of heart failure that was partially induced by the trauma inflicted, so that petitioner could steal money or possessions. As the Board determined, his actions demonstrated a callous disregard for human suffering, and financial gain is a trivial reason to commit murder. In order to fit the regulatory description for this unsuitability factor, however, the circumstances of the crime must have been more aggravated or violent than the minimum necessary to sustain a conviction for that offense. *Rosenkrantz*, 29 Cal. 4th at 682-83. In addition, in order to fit the regulatory description for triviality, the prisoner's motive must have been more trivial than those which conventionally drive people to commit the offense in question. *See In re Scott*, 119 Cal.App.4th 871, 893 (2004) (reasoning that all motives for murder could reasonably be deemed "trivial").

Based on California's construction of its own laws, it is questionable whether petitioner's commitment offense fits the regulatory description for one that is so heinous, atrocious, or cruel that it continues to be predictive of current dangerousness this many years

---

[2] In another case, *Hayward v. Marshall* (512 F.3d 536, 546-47 (9th Cir. 2008), a panel of the Ninth Circuit determined that under the "unusual circumstances" of that case, the unchanging factor of the gravity of the petitioner's commitment offense did not, by itself, constitute some evidence supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society. However, on May 16, 2008, the Court of Appeals vacated the decision in order to rehear it en banc. *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in *Hayward* is no longer citable precedent.

later. In this case, however, the Board relied on additional unsuitability factors. Here, as in *In re Shaputis* (the companion case to *In re Lawrence*), the Board was troubled not only by the nature of petitioner's commitment offense, but also by evidence that it was the culmination of previous violent, criminal behavior. *See In re Shaputis*, 44 Cal.4th 1241, 1260 (2008). A record of violence may tend to show a prisoner's unsuitability for parole where "the prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim... [or] demonstrated serious assaultive behavior at an early age." 15 Cal. Code Regs. § 2281(c)(2).

Petitioner has a significant criminal history. On April 31, 1970, he was arrested for an armed robbery and attempted murder in Louisiana. (Ex. G at 21.) Petitioner had threatened the victim with a large knife and struck her in neck and hand with the blade of the knife. (*Id*.) He was convicted of armed robbery and incarcerated for a period of time in a state hospital. (*Id*. at 16.) Petitioner was later released and terminated from his parole term on an unsatisfactory basis with the special condition that he not return to Louisiana. (*Id*.) In 1975, he was arrested in Oakland and again convicted of robbery. (*Id*. at 22.) The information available to the Board indicated that on this occasion, a woman dropped ten dollars in the parking lot and petitioner stomped on her hand in order to take the money away. (*Id*.) Also in 1975, he was arrested for and convicted of battery on a peace officer and disorderly conduct. (*Id*. at 24.) Petitioner was on parole at the time of his 1975 commitment offense. (*Id*. at 40.) In 1978, he was arrested for and convicted of possession of a hypodermic needle. (*Id*. at 25.) In 1980, he was arrested for various offenses and convicted of another robbery with use of a firearm. (*Id*. at 26.)

As petitioner asserts, his commitment offense and criminal history are two unsuitability factors that he can never change, and their predictive value may be questionable after a very long period of time. This case, however, is not one where continued reliance on unchanging factors has resulted in a due process violation, nor one where the Board has relied solely on unchanging factors. The Board additionally cited petitioner's lack of insight,

insufficient programming, inconclusive psychological evaluation (*see* 15 Cal. Code Regs. § 2281(c)(5) (a lengthy history of severe mental problems is a circumstance tending to show unsuitability)), and prison disciplinary history (*see* 15 Cal. Code Regs. § 2281 (c)(6) (serious misconduct in prison or jail is a circumstance tending to show unsuitability)).

Since the start of incarceration for his life offense in 1984, petitioner received three CDC 115 disciplinary reports, with the most recent one received in January of 1996 (*Id*. at 85.) He completed one vocation, shoe repair, and has been assigned the Dental Lab as a technician since October of 1995, where he received positive reviews from supervisors. (*Id*. at 41.)

Petitioner's most recent psychological evaluation at the time of the decision under review indicated that he suffered from polysubstance dependence, which was in institutional remission. (*Id*. at 46.) He was formerly diagnosed with paranoid schizophrenia, which was also in remission. (*Id*. at 46, 48.) The evaluator concluded, however, that the past schizophrenia may have been drug induced. (*Id*. at 47.) The Board was concerned about petitioner's history of schizophrenia and the lack of a clear diagnosis on this factor. One commissioner stated "I'm talking about specifically this issue that kept -- that kind of kept crossing up about whether or not you were schizophrenic or whether or not it was something related to you using substances." (*Id*. at 48.) It was noted that in addition to being committed to the state hospital in Louisiana for a period of time, petitioner had been committed by his sister to a mental hospital in Berkeley at some point. (*Id*. at 50.)

The psychological evaluator concluded that petitioner presented a lower than average risk of danger in the community, in comparison to other inmates in the institution, but indicated that alcohol or drug relapse could be a problem in the future and that petitioner needs to be involved in AA and NA on a continual basis. (*Id*. at 47.) Despite the evaluator's recommendation, petitioner had not attended AA or NA since June of 2002. (*Id*. at 44.) He stated that he quit going to NA because he no longer desired to use narcotics. (*Id*. at 44.)

9

For two years prior to the 2005 hearing, petitioner was involved as a facilitator for a Motivational Development Group in which prisoners serving life sentences share their stories with other inmates in an effort to motivate them to change their lifestyle. (*Id*. at 42.) There is no evidence in the record of any additional programming participation. The Board concluded that in light of petitioner's history and lack of program participation, there was no indication that he would behave differently than he had in the past if paroled. (*Id*. at 88.) It was recommended that petitioner participate in self-help programming in order to understand and cope with stress in a nondestructive manner, and to build insight into the underlying factors that led to the commitment offense and the impact of the crime on others. (*Id*. at 87.)

In this case, the record contains with respect to an assessment of petitioner's current dangerousness both positive and negative factors, which this court is precluded from re-weighing. Due process requires that the Board's decision be supported only by some evidence in the record and that modicum is present in the instant case. There is some support for the Board's conclusion that petitioner would still pose a risk of danger to the public if released, based on his previous record of violence including the commitment offense, considered together with his psychological history of mental problems, minimal program participation including self-help, and lack of demonstrated insight into his past criminal behavior. The Board's decision meets the minimally stringent test set forth by the Ninth Circuit in *Biggs*, *Sass*, and *Irons*. The decision of the Napa County Superior Court upholding the Board's denial of parole is thus not contrary to, or an unreasonable application of any clearly established federal due process law. Accordingly, petitioner is not entitled to relief on his claim that the Board's decision finding him unsuitable for parole on June 15, 2005 violated his right to due process.

        B.    The application of DSL parole criteria to petitioner's parole consideration did not violate the Ex Post Facto Clause.

Petitioner contends that the application of California's current parole suitability regulations, promulgated pursuant to California's Determinate Sentencing Act of 1976, violated

the Ex Post Facto Clause because they were not in effect at the time he committed his crime in 1975.

The Ex Post Facto Clause prohibits Congress from enacting laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *California Dep't. Of Corrections v. Morales*, 514 U.S. 499, 504 (1995) (citing *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). For a law to be ex post facto, "it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29 (1981). Contrary to petitioner's claim, the Ninth Circuit has held that "the application of the DSL parole-suitability guidelines to prisoners sentenced under the ISL does not disadvantage them, and therefore does not violate the federal constitutional prohibition against ex post facto laws." *Connor v. Estelle*, 981 F.2d 1032, 1034 (9th Cir. 1992). This is because the DSL guidelines require consideration of the same criteria as did the ISL. *Id*. (citing *In re Duarte*, 143 Cal. App.3d 943, 951 (1983)).

Petitioner cites *In re Stanworth*, 33 Cal. 3d 176, 183 (1982) as support for his claim of an ex post facto violation. In *Stanworth*, the California Supreme Court determined that the differences between the Determinate Sentencing Law and Indeterminate Sentencing Law were more than just procedural and could potentially have a detrimental affect on prisoners. *Id*. at 183. Accordingly, the *Stanworth* court concluded that an inmate sentenced under the ISL is entitled to have his release date calculated under the more beneficial of either the ISL or DSL guidelines. *Id*. at 187-88. As respondent points out, *Stanworth* concerned the setting of a parole release date after a prisoner has been found suitable for parole. *Id*. at 178-79. Here, petitioner has not been found suitable for parole. If he is found suitable for parole at some point in the future, his release date will presumably be calculated pursuant to the more beneficial law, as *Stanworth* directs. Petitioner has not suffered an ex post fact violation.

/////

/////

V.  CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 15, 2009

_Charlene H. Sorrentino_
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE